WhitaKee, Judge,
concurring in the dissent:
I am in complete agreement with this dissent, and I wish to supplement it with this observation.
The majority correctly says the so-called liquidated damages provision is in fact a provision for a penalty. It is a penalty for the violation of a law. It is civil in nature, it is true, but it is, at the same time, tantamount to a fine for the violation of a law. This being true, I do not think the regulation of a department can set aside the presumption of innocence and cast upon the accused the burden of proving that it is not guilty.
If this regulation is invalid, there is no proof whatever of plaintiff’s guilt. The money it paid was not in satisfaction of a penalty validly assessed, but, as Judge Laramore says, to “buy his peace”, to avoid, at the least expense, the unjustified demand made upon it.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Kobert K. McConnaughey, and the briefs and argument of counsel, makes findings of fact as follows:
*598 1. Plaintiff is a Delaware corporation. Its principal place of business is in Elgin, Illinois. In 1929, plaintiff acquired all the capital stock of Bussman Manufacturing Company, a corporation engaged in the business of manufacturing fuses and circuit protectors. In 1934, Bussman Manufacturing Company was merged into plaintiff. At all times since, it has been operated as the Bussman Manufacturing Division of plaintiff. In 1957, plaintiff’s name was changed from “McGraw Electric Company” to “McGraw-Edison Company.”
2. Plaintiff kept its books and records on the calendar year and accrual basis of accounting, and filed its Federal corporation income and excess profits tax returns on the same basis for the taxable years 1944 and 1945.
3. On June 15,1946, plaintiff filed its Federal income and declared value excess profits tax return for 1945 with the Collector of Internal Revenue for the First District of Illinois (hereafter called the “Collector”) and paid the income tax liability shown thereon on the following dates and in the following amounts:

A 'm.nitAl.i: n-f Bate of Payment Payment

March 15, 1946_$144, 536. 00
June 14,1946_ 136, 659.45
September 13, 1946_ 139, 811.73
December 16, 1946_ 139, 811. 73
$560, 818.91
Upon a subsequent audit, the Commissioner of Internal Revenue (hereafter sometimes referred to as the “Commissioner”) determined an overpayment of $10,531.43 of income taxes for 1945 attributable to the allowance by the Commissioner of amortization deductions with respect to certain patents owned by plaintiff. The overpayment was credited against Federal taxes then due and owing by plaintiff for 1943 and 1944. Plaintiff’s income tax liability for 1945, as finally determined by the Commissioner and paid by plaintiff, was $550,287.48.
4.On June 15,1946, plaintiff filed its Federal excess profits tax return for 1945 with the Collector and paid the tax *599 liability sliown thereon on the following dates and in the following amounts:

Amount of Date of Payment Payment

March 15, 1946_$18,750.00
June 14, 1946_ 14,015. 86
September 13, 1946_ 16,382.93
December 16, 1946_,_ 16,382.93
$65,531. 72
A subsequent agreement was entered into determining excessive profits for 1945, and excess profits taxes of $64,125 paid for said year were credited against excessive profits determined, under the provisions of 26 IJ.S.C. § 8806. Upon a subsequent audit, the Commissioner determined an overpayment of $1,406.72 of excess profits taxes for said year, also attributable to the amortization allowances described in finding 8. Plaintiff’s excess profits tax liability for 1945, as finally determined by the Commissioner, was zero.
5. During the years 1941 through 1943, plaintiff’s Bussman Manufacturing Division (hereafter sometimes referred to as “Bussman”) was in part engaged in the performance of contracts with the defendant, both as a prime contractor and as a subcontractor, for the production of fuses and related products. Each of said contracts contained substantially the following provisions:
The following representations and stipulations pursuant to the Walsh-Healey Public Contracts Act (Act of June 30,1936; 49 Stat. 2036; 41 U.S.C. 35-45; Public No. 846, 74th Congress), shall apply to the performance of this contract:
* * * * *
(d) No male person under 16 years of age and no female person under 18 years of age and no convict labor will be employed by the Contractor in the manufacture or production or furnishing of any of the materials, supplies, articles, or equipment included in the contract.
$ ‡ ‡ $
(f) Any breach or violation of any of the foregoing representations and stipulations shall render the party responsible therefor liable to the United States of America for liquidated damages, in addition to damages for any other breach of the contract, in the sum of fid *600 per day for each male person under 16 years of age or each female person under 18 years of age, or each convict laborer knowingly employed in the performance of the contract. * * *
(g) The Contractor shall post a copy of the stipulations in a prominent and readily accessible place at the site of the contract work and shall keep such employment records as are required in the Eegulations under the act available for inspection by authorized representatives of the Secretary of Labor.
(h) The foregoing stipulations shall be deemed inoperative if this contract is for a definite amount not in excess of $10,000.
(i) This Article shall be subject to such exemptions and exceptions as have been authorized, or shall hereafter be authorized from time to time, by the Secretary of Labor or otherwise in accordance with law, so long as such exemptions or exceptions shall remain in effect. * * *
6. Under date of February 22,1944, Mr. Walter W. King, Eegional Director, U.S. Department of Labor, Wage and Hour and Public Contracts Division, Kansas City, Missouri, wrote to Mr. A. B. Bussman, President and Treasurer of Bussman, notifying Mr. Bussman that the report of an inspection by the St. Louis Branch Office of the said Divisions “disclosed” breaches of the above-quoted contract provisions by Bussman, in that minors had worked on government contracts. This letter stated charges, said to be based upon inspection of records on file in plaintiff’s office, as follows:
Kecords on file in your office show that one minor boy worked on Government contracts for a period of 5 days from June 21,1948, to June 25,1943, inclusive, while he was under the age of 16 years, and that 750 minor females between the ages of 15 and 18 years were employed in violation of the child labor provisions of the Public Contracts Act. The summarization of these violations as shown on the attached sheets shows that the violations consisted of the employment of females under the age of 18 years on G-overnment contracts prior to April 21, 1942, and the employment of females under 18 years of age in violation of the conditions of employment for female employees under 18 years of age on Government contracts as specified by the Secretary of Labor after April 21, 1942. The violations *601 after April 21, 1942, resulted from the employment of females under 16 years of age, which is specifically prohibited by Condition No. 1 of the above referred to Exemption Order, and the employment of females under 18 years of age in excess of 8 hours a day or between the hours of 10 P.M. and 6 A.M., which is specifically prohibited by Condition No. 2 of the above referred to Exemption Order. The total number of days of violation in regard to females is 68,960, and occurred from January 8, 1941, to March 5, 1941, and from October 2,1941, to the date of the inspection.
* * * He *
Pursuant to the provisions of the contract quoted above, and of the Walsh-Healey Act, this letter also stated, “As a result of the violations of the child labor provisions of the Act, there are due the United States Government liquidated damages in the amount of $689,650;” and requested that Bussman forward its certified check, payable to the Treasurer of the United States, in that amount to Mr. King “unless you [Bussman] desire to take issue with the facts or the law as applied to them.”
7. On June 13,1944, a Complaint dated June 9,1944 (hereafter referred to as the “Complaint”), entitled “In the Matter of BUSSMAN MANUFACTURING COMPANY, a corporation; A. B. BUSSMAN and J. A. BUSSMAN, individually, and as officers of the BUSSMAN MANU-FACTUBING COMPANY; and McGEAW ELECTEIC COMPANY, a corporation, Eespondents,” No. PC-174, was filed with the Chief Trial Examiner of the Division of Public Contracts of the Department of Labor. This Complaint charged that the respondents had violated (a) provisions of specified government contracts it was performing, (b) the provisions of Section 1(d) of the Walsh-Healey Act, and (c) the provisions of the April 21, 1942 order of the Secretary of Labor, by reason of their employment in the performance of government contracts of: (1) 216 females under 18 years of age and one male under 16 years of age for designated periods of time from January 10, 1941, through April 20, 1942; (2) 65'8 females under 18 years of age for designated periods of time from April 21, 1942, through July 30, 1943; and (3) 5 females under 16 years of age for designated periods of time from April 21, 1942, *602 through July 10, 1943. Paragraph XII of this Complaint alleged that the respondents had, by virtue of their breaches of contract and violations of the Walsh-Healey Act and Regulations under it, become liable and indebted to the United States Government in liquidated damages in the sum of $10 for each day each underage employee was knowingly employed in the performance of the government contracts.
8. During the period of time of the alleged breaches and violations, plaintiff employed 745 females of 16 and 17 years of age on its customary day work shift of 9 hours. Plaintiff’s employment of these females for such hours was permissible under the laws of Missouri. During that period, said females and the one male and five females under 16 years of age, specified in the Complaint, worked on a total of 68,965 days.
9. Plaintiff did not maintain separate records for employees working on government contracts, nor were employees working on government contracts physically segregated from other employees. The evidence is conflicting as to whether the individual employees’ time cards, if examined, would have shown what contracts each one worked on each day.[1] On the basis of the whole record, it appears more likely that the records did not clearly or consistently identify the contracts on which individual employees worked. The evidence does not disclose whether, either in formulating the charges initially made or in reviewing the facts thereafter, before accepting a payment almost exactly equal to 10 percent of the penalty originally sought to be imposed, the Department of Labor’s investigators examined or relied upon the time cards of the individual employees as an index of the contracts they worked on, although it does appear that they did examine and rely upon the time cards as a basis for charges of overtime violations. The amount of the penalty initially proposed to be assessed indicates that originally a violation was charged for each underage female employed by *603 the plaintiff during the period in question and for each day such female was employed. If each of such underage females had worked all of each day she was employed during that period on government contracts plaintiff then had, the quantity of products produced by plaintiff under such contracts would have been several times greater than the quantity plaintiff did produce during that period.
10. Article 501 of the Regulations prescribed by the Secretary of Labor under the Walsh-Healey Act (41 C.F.R. § 201.501) (hereafter referred to as Article 501 of the Regulations) included the following provisions:
Every contractor subject to the provisions of the act and this part shall maintain the following records of employment which shall be available for the inspection and transcription of authorized representatives of the Secretary of Labor:
❖ * * * *
(c) Wage-and-hour records for each such employee including the rate of wages and the amount paid each pay period, the hours worked each day and each week, and the period during which each such employee was engaged on a Government contract with the number of such contract. Compliance with this paragraph shall be deemed complete if wage-and-hour records for all employees in the plant are maintained during the period between the award of any Government contract and the date of delivery of the materials, supplies, articles, or equipment: Provided, That where no separate records for employees engaged on Government contracts are maintained, it shall be presumed until affirmative proof is present to the contrary that all employees in the plant, from the date of award of any such contract until the date of delivery of the materials, supplies, articles or equipment, were engaged on such Government contract. $ $ ‡ ‡ ‡
11. Bussman’s management believed that precautions, hereafter described, which it had taken to prevent violations of the child labor limitations imposed, in respect of government contracts, by the Federal statutes and regulations, and by the government contracts themselves, had been effective and that few, if any, violations had occurred. Accordingly, Bussman initiated efforts directed toward disposition of the *604 charges on some basis that would involve a minimum of expense in terms of time and money.
As a part of these efforts, Mr. A. B. Bussman had personal conferences in 1944 with the Secretary of Labor and with the Commissioner of Internal Bevenue regarding the possibility of tendering a minimal offer in settlement of the defendant’s claim for liquidated damages and regarding the deductibility of any such settlement for Federal income tax purposes. It was his impression, as a result of these conferences, that the Secretary of Labor had advised him to make such an offer, and that the Commissioner had assured him orally that a payment made pursuant to such an offer would be deductible for Federal income tax purposes, although the Commissioner had refused Mr. Buss-man’s request for a written statement of the views he had expressed orally.
12. On or about December 14, 1944, plaintiff offered its check for $68,965 in compromise settlement of defendant’s claim for liquidated damages arising from the purported breaches and violations alleged in the Complaint.
Plaintiff’s letter dated December 14, 1944, and signed by Mr. W. Gr. Marbury, who had been employed as attorney to represent plaintiff in the case, was as follows:
This will confirm our all day conference of Friday, December 1, 1944, at which time the entire factual conditions surrounding the complaint filed against the above was discussed.
It is agreed that the over-time violations which aggregate $2,367.87 and involve 863 separate employees is due and shall be paid. However, I feel sure that it is the mutual opinion of the Department, and my client, that this results from clerical errors, and was not an intentional violation.
As regards the alleged violations resulting from the employment of female employees between the ages of 16 to 18 prior to April 21,1942, and the employment of females over 16 and under 18 subsequent to April 21, 1942, (all of which worked nine hours per day) it is agreed that time records were not kept which will show the contracts which these employees, or any employees, worked upon. However your file indicates, and it is a fact, that the management determined, as a matter of policy, that the 'under-age employees would be segre *605 gated and not permitted to perform work on contracts subject to the Walsh-Healey Act. This policy was carried out in the following manner:
A. B. Bussmann, President, in conference with Joseph A. Bussmann and Frank H. Bussmann, Plant Managers, decided that a practical method of segregating underage employees so that they would not work on contracts subject to the Walsh-Healey Act was to create a department, in each department, of under-age employees and to instruct their subordinates, such as floor-ladies and department supervisors, to segregate the work being done under contract subject to the Walsh-Healey Act, and not to assign any of that work to any under-age employee. This policy was carried out for all departments, with the exception of the Plug Fuse Department and the Shipping Department.
As regards the Plug Fuse Department, it is the only line assembly production in the plant. Here the first operation consists of placing a rivet in a porcelain body, after which the assembly is carried from one operation to another by means of conveyor belts. It was the intention of the management to eliminate any under-age employees in this Department. However, subsequent investigation shows that a few under-age employees were working in the Plug Fuse Department during the time that Department was engaged in manufacturing articles subject to the Walsh-Healey Act, and further investigation shows that though this was a negligible part of the day’s production of the Department there were eighteen (18) separate days in which some quantity of the total production was used to fill orders subject to the Walsh-Healey Act.
As regards the Shipping Department, there were a few under-age employees employed in this Department during the period under investigation. However, the duties assigned these under-age female employees were the handling of parcel post shipments. My client is convinced that it would be the exception if any material purchased on order subject to the Walsh-Healey Act was shipped by parcel post. However, there were under-age employees in the Department, though we are convinced they did not work on orders subject to the Walsh-Healey Act.
As regards all other departments, the method of segregation of under-age employees as heretofore related was carried out by the management and its subordinate employees. Frankly, to contend that during the entire period covered by your investigation there were no “slip- *606 ups” in tbe execution of the company’s policy of segregating under-age employees would be, to say the least, a difficult position to maintain.
In view of all the circumstances as discussed with your Department, and a willingness on the part of my client to dispose of this vexatious problem in a fair and just manner, I am authorized to offer in full and complete settlement 10% of the amount alleged to be due by your Department, or the sum of $68,965.00, for which amount I enclose herewith my client’s check. This offer is made without prejudice and with the understanding that it shall not be used against my client at any future time should it not be accepted.
The offer is actually more, in my judgment, than is due, for the reason that the aggregate Walsh-Healey production during the period under investigation aggregates $887,447.53; whereas, the total business of my client during the same period amounts to $9,920,671.90. In other words, the Walsh-Healey production represents less than 9% of the total population.
This fact clearly illustrates that were my client in violation of the Walsh-Healey Act at all times less than 10% of the under-age employees’ total time would have been spent in the production of articles covered by the Walsh-Healey Act. When this is considered, with the additional fact that during the period under investigation there were several times more over-aged employees than there were under-age employees, the liability alleged by your Department becomes an impossibility.
It is my frank opinion that the alleged liability of my client results from their lack of keeping adequate books and records to comply with your rules and regulations. However, in fairness to my client, you must consider that literally hundreds of millions of fuses are made each year, and the cost of keeping time records of all employees would, from proven experience, be impractical, if not impossible. I believe this position is understood by your Department.
In consideration of the contents of this letter, and the many conferences had with the Labor Department relative to this case, I earnestly request your consideration of this offer and will await your reply.
13. On April 6, 1945, L. Metcalfe Walling, Administrator of the Wage and Hour Division of the Department of Labor, returned plaintiff’s check, stating, in a letter bearing that date, that the Department of Labor had no authority to compromise its claim upon payment of a percentage of the *607 amount due, and suggesting that a further investigation might show that the liquidated damages due were somewhat less than $689,650. Mr. Walling’s letter was as follows:
I refer to your letter of December 14, 1944 enclosing a check for $68,965 which you tendered in settlement of the liquidated damages due from the Bussman Manufacturing Company under the Walsh-Healey Public Contracts Act. This sum is approximately ten per cent of the amount which the inspection showed was owing.
I return herewith the check which you tendered. The Department of Labor has no authority to compromise a claim of this kind upon payment of a percentage of the amount due. Moreover, the Department in the past has consistently refused to accept a payment of liquidated damages calculated by assuming that the same percentage of the total number of children employed in the plant was employed on government work as the value of the government contracts bears to the plant’s total production. Manifestly, it cannot treat the Bussman Company differently.
One of two courses is now open. There is some reason to believe that a more detailed investigation of the circumstances under which these government contracts were performed would show that the amount of liquidated damages due for child labor penalties is somewhat less than $689,650. The Regional Director and Regional Attorney have suggested that such an investigation could be made if the company were prepared to cooperate with the investigators and seriously attempt to develop the actual facte. It seems quite apparent, however, that such 'an investigation would be unavailing and that no progress could be made toward terminating the case on such a basis unless the company is prepared to bandon its attempts to secure a closing of the case upon payment of a percentage of the sum ■already assessed and to come forward with more detailed information than general statements that it was the company policy to segregate government work from non-government work and employs [sic] girls under 18 only on the latter. I should be glad to hear from you whether ■the company is now prepared to make a serious effort along these lines.
The other alternative is for the Solicitor of Labor to mark this case up for a hearing and to have the facts developed in full by that method. This has the disadvantage attendant upon all formal procedure and also would, of course, make impossible any informal resolu *608 tion of conflicting issues of fact by discussion along common sense lines.
In 'the meantime, hearing on the present complaint may stand as continued indefinitely. In the event that a further investigation is agreed to as suggested above, but there is an ultimate disagreement between your client and the Department, then the case may be prosecuted in the manner prescribed in all such complaint cases. _
_ In closing I should point out that I cannot agree with a number of statements in your letter, particularly the 'assertion that the Department’s file shows that the management of this company actually adopted a policy of segregating government and non-government work and of not permitting girls under 18 to perform work on contráete subject to the Walsh-Healey Act.
14. On or about June 29, 1945, a stipulation was entered into between counsel for the respondents named in the Complaint and counsel for the government. It recited “That the respondents hereby tender their certified check in the amount of $68,970 in payment of liquidated damages for the employment of female minors, contrary to the provisions of the Public Contracts Act stipulations in their several government contracts and contrary to the provisions of the Secretary of Labor’s Exemption Order for 6897 days; * * *, with the understanding that the acceptance of the above liquidated damages * * * is in full satisfaction of all matters which are the subject matter of the complaint of the Secretary of Labor herein against the respondents, and that said complaint will be withdrawn upon such acceptance.”
15. On or about June 29, 1945, plaintiff’s offer, referred to in the stipulation, was accepted by the defendant, and on that date an order was entered by the Division of Public Contracts, Department of Labor, withdrawing the Complaint. This order recited that respondents therein had delivered to the Division of Public Contracts a cashier’s check payable to the Treasurer of the United States “for the sum of $68,970 in payment of the liquidated damages due for such illegal employment”.
16. The record does not show what further investigation, if any, was made by the Department of Labor between its rejection, on April 6, 1945, of plaintiff’s original offer of $68,965, phrased as a compromise settlement, and its acceptance, on June 29, 1945, of plaintiff’s subsequent offer of *609 $68,970, phrased as a payment of liquidated damages for specified violations.
17. During the entire period in which the purported violations were alleged by the Complaint to have occurred, the total sales made by Bussman to all of its customers exceeded $12,000,000. The total sales made pursuant to the government contracts enumerated in the Complaint were somewhat less than $1,000,000. Bussman employed between 600 and 1200 people during said period, the number increasing as time passed. Of these, on the average, about 12 percent were females under 18 years of age.
18. Throughout the entire period from January 10, 1941, through July 30, 1943, Bussman manufactured a complete line of electrical fuses used for both military and civilian purposes. These fuses were of five general classes and were assembled in five separate departments, as follows: Renewable Fuse Department; One-Time Fuse Department; Glass Tube Fuse Department; Cartridge Fusetron Department; and Plug Fuse Department. In addition to those assembly departments, Bussman had a Parts Production Department, a Shipping Department, a Laboratory and a Machine Shop, and no females under age 18 were employed in its Parts Production Department. A few females under age 18 were employed to read meters in the Laboratory and to handle small packages in the Shipping Department.
19. At all times during the period of the alleged violations, Bussman’s manufacturing processes consisted essentially of the following: Parts were produced in the Parts Production Department. They were then delivered to the appropriate department for assembly, where they were placed in trays, in which they remained throughout the entire assembly operation. The parts, in their trays, were assigned by the forelady in charge of the department to various employees for the assembling operation. After all of the assembly operations were completed, the completed fuses were boxed and delivered to the Shipping Department for shipment to customers. The forelady in charge of each assembly department, by means of a factory order, was notified of the orders which her department was to assemble.
20. Substantially all fuses for government contracts were *610 assembled to order. Their specifications differed from fuses made for civilian use, and few, if any, were kept in stock. All government contract orders were readily identifiable by reason of the type or designation of fuse involved, or by reason of lettering or numbering on the fuse components. In addition, in some cases distinctive markings were placed on the trays containing parts for government contracts. The foreladies were specifically instructed that under no circumstances were any females under age 18 to perform, any work on orders involving government contracts. All foreladies were furnished with the names and ages of all employees in their departments and instructed the employees in their charge that under no circumstances were any females under age 18 to perform any work on. the trays containing parts for government contracts. The foreladies made personal observations to ascertain whether their instructions were carried out.
The arrangements just described were reasonably well adapted to minimize violations and, if conscientiously carried out, might, with a little bit of luck, forestall them entirely. But obviously they were not foolproof. Even in the absence of intention to violate, or gross carelessness, violations could have happened through inadvertence. There is no direct proof in this record to show whether violations did or did not occur.
21. Neither plaintiff’s officials nor the managers of Buss-man admit to being informed, before the Department of Labor commenced its investigation, that violations of the child labor requirements of their government contracts were suspected.
Nor were they convinced thereafter that such violations had occurred. As Mr. A. B. Bussman vigorously maintained at the trial, they believed that their instructions had been carried out and that no underage females had been employed on government contracts.
The Complaint having been filed, however, they were confronted with the alternatives of either paying about 10 percent of the total amount claimed in the Complaint or, with records of dubious adequacy fully to overcome the presumption of violations created by the proviso of Article 501 of the *611 Regulations, litigating the controversy in an effort to show that very few, if any, violations had occurred. ■
They chose the former alternative, primarily with the objective of avoiding the risks, and the expense, inconvenience and other disruptive consequences of litigation.
Viewed broadly, a disposition of litigation so motivated, and based on payment of almost exactly 10 percent of the penalty originally claimed, presents the appearance of a compromise settlement, as that expression is commonly used.
It may be contended here, however, that the form of the closing papers and the presumption of violation created by Article 501 of the Regulations, distinguish the disposition made of this particular complaint from an ordinary compromise settlement. The following facts may be pertinent to a decision concerning the legal validity and effect of such distinctions.
(a) The form of the transaction.
Persons representing the Department of Labor, having in April 1945 rejected the $68,965 offered as a compromise on the ground that the Department of Labor had no authority to accept a compromise based on payment of a percentage of the amount due, carefully preserved, in the documents recording the ultimate disposition of the Complaint, forms of words that described the $68,970 accepted in June 1945 as liquidated damages for the employment of underage females on government contract work for 6,897 days.
Mr. A. B. Bussman was the company official who represented Bussman in the negotiations leading up to the disposition of the Complaint. It is evident from his testimony that he personally regarded the arrangement whereby Buss-man paid $68,970 in full satisfaction of all claims, and the government withdrew its complaint, as a compromise settlement for about 10 percent of the penalty originally claimed. It is equally evident that he did not concern himself with such legal niceties as whether the closing documents were phrased to reflect a compromise settlement or a payment of liquidated damages as a penalty for specified violations.
The record does not show how Bussman’s lawyers regarded the arrangement.
*612 (b) The substance of the transaction.
This record does not show how the figures that form the basis for disposition of the Complaint were arrived at.
There is no showing that the Department of Labor had affirmative evidence to prove, as a basis for imposition of $68,970 of liquidated damages, that underage females had been employed on government contract work for exactly 6,897 days, or for any other specific number of days.
Thus, as far as this record is concerned, the disposition of the Complaint appears to have been based on the presumption created by Article 501 of the Regulations that, in the absence of the required records, and to the extent that affirmative proof to the contrary was lacking, underage employees working for Bussman during the period covered by the Complaint were working on government contracts.
The record does not show, however, how the figure of 6,897 days — one-half day more than 10 percent of the total number of days worked by underage employees — was arrived at.
By statistical evidence of the kind described in preceding findings, Bussman probably could have made a convincing-showing that its underage employees had not spent all of their 68,965 working days on government contracts. But this record does not show that Bussman could have produced affirmative proof that its underage employees spent no time on government contracts, nor does it show by what affirmative proof Bussman satisfied the Department of Labor that its underage employees were engaged on work other than government contracts on 62,068 of the 68,965 days they worked during the period covered by the Complaint.
Thus, despite the form of the transaction as described in the closing papers, and the government’s reliance on the presumption in lieu of affirmative proof to sustain the position that the amount paid was a penalty and not a compromise settlement, there remains, as far as this record shows the facts, an element of arbitrary adjustment in the fixing at 6,987 days the amount of working time which formed the basis of the payment made.
22. Plaintiff claimed a deduction as a business expense of $68,965 in its Federal income and declared value excess profits tax return for 1944, which was filed on or about *613 June 15,1945. The deduction was claimed in “Schedule K— Other Deductions,” as follows:
Settlement of claim under Walslt-Healy Public Contracts Act_$68,965.00
The Commissioner of Internal Revenue disallowed the claimed deduction, and determined a deficiency in excess profits taxes for 1944, in part based upon that disallowance. The deficiency was paid by plaintiff on May 28, 1948. On June 30, 1949, plaintiff filed a timely claim for refund of $58,965.07 of Federal excess profits taxes for 1944 on the ground that the deduction was allowable. The Commissioner of Internal Revenue took no action with respect to that claim. Thereupon, on July 21, 1950, plaintiff filed a suit for refund in the District Court of the United States for the Northern District of Illinois, Eastern Division, entitled “McGraw Electric Company v. John T. Jarecki and Nigel D. Campbell, Civil Action No. 50C1038,” based upon the grounds set forth in said claim for refund. The grounds stated were as follows:
In December, 1944 the deponent paid an amount of $68,965.00 as a compromise settlement of a claim asserted against it for alleged violation of Section 1(d) of the Walsh-Healey Public Contracts Act. This payment was claimed as a deduction in the deponent’s excess profits tax return for the calendar year 1944 but was disallowed by the examining officer in his report transmitted under date of July 6,1948, covering examination of the income and excess profits tax returns of the deponent for the calendar years 1942,1943,1944 and 1945. The deficiency in excess profits tax as proposed in the examining officer’s report was paid by the deponent on May 28,1948 (see schedule attached hereto).
The deponent contends that the disallowance of the payment as a deduction was erroneous and that it resulted in an overstatement and overpayment of its excess profits tax liability for the calendar year 1944 in the amount of $58,965.07. Refund of this amount of overpayment together with interest thereon is respectfully requested.
The answer and amended answer filed in the suit interposed two defenses: (1) that the claimed deduction did not constitute an allowable deduction, and (2) that the claimed deduction was not allowable for the year claimed, i.e., 1944. *614 Thereafter, the suit was dismissed with prejudice on stipulation of the parties, on October 2, 1952. The applicable statute of limitations upon the allowance of refunds or credits of plaintiff’s 1945 Federal income taxes, other than as provided in Section 3801 of the Internal Eevenue Code, expired prior to October 2, 1952.
23. On December 17,1953, plaintiff filed with the District Director of Internal Revenue at Chicago, Illinois, a claim for refund of Federal income taxes for the taxable year 1945, in the amount of $27,588, together with interest as provided by law. The grounds stated were as follows:
On December 14,1944, taxpayer tendered to the United States a check in the amount of $68,965.00 as a compromise settlement of a claim by the United States in the amount of $689,650.00 for liquidated damages resulting from an alleged breach of contract in violation of Section 1(d) of the Walsh-Healey Public Contracts Act, 41 U.S.C. .§ 36. Taxpayer’s tender was rejected and taxpayer’s check was returned to it on or about April 6,1945. On or about June 29,1945, taxpayer delivered its check in the amount of $68,970.00 to the United States, which was accepted as settlement in full.
The alleged liability of taxpayer under said Walsh-Healey Act was based upon a presumption contained in regulations promulgated by the Secretary of Labor, that since taxpayer had maintained no separate records with respect to employees engaged in working on government contracts in its Bussman Manufacturing Division in St. Louis during the years 1941 through 1943, it would be presumed that any underage females employed there during that period were engaged in working on government contracts, in contravention of the provisions of the Walsh-Healey Act which were incorporated into taxpayer’s contracts with the United States. Taxpayer committed no violations of the Walsh-Healey Act during the said period. Even assuming that any such violations had occurred, such violations would have been entirely inadvertent and by mistake not occasioned by taxpayer’s negligence.
Taxpayer deducted the said amount of $68,965.00 in ascertaining its net income for 1944 on its 1944 Federal income and excess profits tax returns. Said deduction was disallowed by an agent of the Commissioner of Internal Revenue in a report dated June 2, 1948. On June 30,1949, taxpayer filed a claim for refund of Federal excess profits taxes for the year 1944 in the amount *615 of $58,965.07, by reason of said disallowance. On July 21, 1950, taxpayer filed a suit for refund in the District Court of the United States for the Northern District of Illinois, Eastern Division, entitled “McGraw Electric Company v. John T. Jarecki and Nigel D. Campbell,” Civil Action No. 50 C 1088. On October 2, 1952, said suit for refund was dismissed with prejudice. Taxpayer filed its Federal income tax return for the year 1945 on or about June 14,1946.
Taxpayer maintains that said amount of $68,970.00 was properly deductible either under Section 23 (a) (1) (A) or Section 23(f) of the Internal Eevenue Code in ascertaining its net income for Federal income tax purposes for the year 1945; that taxpayer is entitled to an adjustment under the provisions of Section 3801 of the Internal Eevenue Code, and particularly, under Section 3801 (b) (6) of the Internal Eevenue Code; and that said adjustment will amount to $27,588.00, as indicated by the attached computation. Eefund of Federal income taxes for the taxable year 1945 in the amount of $27,588.00, or such other amount as may be legally refundable, together with interest as provided by law, is therefore claimed.
On March 8,1955, the District Director of Internal Eeve-nue, at the direction of the Commissioner of Internal Eeve-nue, mailed by registered mail to plaintiff notice of disallowance in full of plaintiff’s claim for refund of Federal income taxes for 1945.
Plaintiff filed its petition in this proceeding on April 21, 1956.
Plaintiff has not received any portion of the amounts claimed in said refund claims, and in this proceeding, nor has plaintiff been credited in any manner, for tax purposes or otherwise, with any portion of the amounts claimed in said refund claims and in this proceeding.
24. Plaintiff is the sole owner of the claim asserted in its petition, and has not made any assignment or transfer of said claim, or any part thereof, or any interest therein.
CONCLUSION ON LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover and its petition is therefore dismissed.

 Mr. A. B. Bussman stated at the trial that the time cards would have revealed the nature of the work each employee performed. (R. 24-25) The letter dated December 14, 1944, from plaintiff’s attorney, proposing a compromise settlement (see finding 12) refers to an agreement In conference that time records were not kept which would show what contracts the individual employees worked on.